HARRIS LAW PRACTICE LLC
STEPHEN R. HARRIS, ESQ.
Nevada Bar No. 001463
NORMA GUARIGLIA, ESQ.
Nevada Bar No. 16244
850 E. Patriot Blvd, Suite F
Reno, Nevada 89511
Telephone: (775) 786-7600
Email: steve@harrislawreno.com
Email: norma@harrislawreno.com

Attorneys for Petitioning Creditors and
Gregory Stoutenburgh
and Xema Fly LLC

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEVADA

* * * * *

|  |  |
|---|---|
| IN RE: | Case No. BK-26-50580-gs<br>Chapter 11 (Involuntary) |
| EPICA INTERNATIONAL, INC.,<br>a Nevada corporation, | **OPPOSITION TO ALLEGED DEBTORS' MOTION FOR ORDER DISMISSING INVOLUNTARY PETITIONS** |
| Alleged Debtor.<br>_____/ | Hearing Date: June 26, 2026<br>Hearing Time: 10:00 a.m. |

Petitioning Creditors[1], and common stockholders Gregory Stoutenburgh and Xema Fly LLC (collectively "**Shareholders**"), through their undersigned counsel, file this *Opposition to Alleged Debtors' Motion for Order Dismissing Involuntary Petitions* (**"Opposition"**).

This Opposition is based on the following points and authorities, the papers and pleadings on file in this case of which Petitioning Creditors and Shareholders ask the Court to take judicial notice of under Fed. R. Evid. 201, any supporting evidence presented, and oral argument of counsel at any hearing on this matter.

---

[1] The "**Petitioning Creditors**" are Devdend LLC, Advanced Imaging, LLC, Sanjeev Kaila, M.D., and e-Possible, Inc.

**SUMMARY**

The Petitioning Creditors hold liquidated, undisputed claims exceeding $2,561,753.49 against Epica International, Inc. ("**Epica**") and Epica Human Health LLC ("**Epica HH**") arising from prepaid but undelivered goods. Contrary to Alleged Debtors' self-serving allegations in the *Alleged Debtors' Motion for Order Dismissing Involuntary Petitions* [ECF No. 27] ("**Motion to Dismiss**"), these claims are not subject to bona fide dispute. On April 8, 2025, Joe Soto, Epica's own Chief Executive Officer, sent an email to Dr. Kaila confirming that the three Petitioning Creditors collectively had paid Epica and Epica HH $17,476,193.23, which resulted in the Petitioning Creditors paying in full for "44 units and only 35 units have been delivered to date." This admission establishes that Alleged Debtors owe the Petitioning Creditors for nine undelivered units at a cost of approximately $390K per unit, a liquidated, undisputed debt.

Moreover, Alleged Debtors' claims of an absence of unencumbered assets are demonstrably false. The Petitioning Creditors have obtained an expert opinion of value from Peter J. Conley of Prestwick Associates LLC, which values Epica's intellectual property assets in a range of $33.9 million to $50.0 million, with a base-case indication of approximately $43.5 million. This valuation far exceeds the approximately $22 million in secured debt claimed by Quantum Scan Holdings, Inc. ("**Quantum**"). Epica's estate therefore likely has substantial equity available for unsecured creditors.

Finally, the Shareholders, who together hold over 21% of Epica's voting common stock, have sought to compel an annual shareholder meeting to replace Epica's illegitimate board of directors, a board that has refused to hold annual shareholder meetings since at least 2023 in violation of Nevada law and Epica's bylaws. On May 20-21, 2026, a majority of Epica's common stockholders (64.4%) voted by written consent to elect a new board of directors. Despite this majority vote, the prior directors have continued to exercise control over Epica and to make

HARRIS LAW PRACTICE, LLC
850 E. PATRIOT BLVD.
SUITE F
RENO, NEVADA 89511
TELEPHONE: (775) 786-7600

decisions, including filing the Motion to Dismiss, without legitimate authority. In summary, the involuntary petitions serve the interests of creditors and shareholders alike by bringing the Alleged Debtors' affairs under the transparent supervision of this Court. The Motion to Dismiss should be denied.

## FACTUAL BACKGROUND

1. The Distribution Relationship and Prepayments: Imaginalis S.R.L. ("**Imaginalis**"), a wholly owned subsidiary of Epica, allegedly entered into a Distribution Agreement dated June 1, 2023, with Advanced Imaging. Between June 1, 2023, and January 31, 2025, the Petitioning Creditors made substantial prepayments for equipment purchases to Epica and Epica HH by wiring the total sum of $17,476,193.23 for the purchase of SeeFactor CT-3 medical imaging units. Dr. Kaila initiated certain wire transfers to Epica and Epica HH on behalf of himself, and also on behalf of his related but separate legal entities, Advanced Imaging. Devdend LLC likewise initiated wire transfers to both Epica and Epica HH to purchase certain CT-3 Units.

On April 8, 2025, in response to a request from Dr. Kaila for an accounting, Joe Soto emailed Dr. Kaila confirming that the three Petitioning Creditors collectively had paid Epica and Epica HH $17,476,193.23 through January 31, 2025, which resulted in the Petitioning Creditors paying Epica and Epica HH in full for "44 units and only 35 units have been delivered to date." In fact. Mr. Soto himself said in the mail that "total deposits made by Advanced Imaging and its partners (collectively 'AI') are $17,476,193.23," thus recognizing that other parties besides Advanced Imaging had paid deposits for the purchase of CT-3 Units. Mr. Soto attached a spreadsheet to his email disclosing each wire payment. This email constitutes an unequivocal admission by Epica's executive officer that Epica and Epica HH (not Imaginalis) received full payment for 44 units from Petitioning Creditors, but delivered only 35, meaning that Petitioning

Creditors, as the parties who made the payments, were entitled to a refund of payments for undelivered units from Epica and Epica HH, the entities that received the payments. *See Declaration of Sanjeev Kaila, M.D.*

2.      Epica's Financial Condition and Secured Debt: Alleged Debtors are allegedly parties to a Loan and Security Agreement dated September 5, 2024, with Quantum as successor administrative agent, collateral agent, and secured lender. Quantum purchased the loan under the Credit Agreement pursuant to an Assignment and Assumption Agreement dated January 29, 2026. Pursuant to the Credit Agreement and related loan documents, Epica granted Quantum first-priority liens and security interests in substantially all of its assets, including intellectual property, accounts, equipment, inventory, general intangibles, investment property, deposit accounts, and equity interests. As of the petition date, Quantum asserted that the obligations under the Credit Agreement exceed $22 million, exclusive of continuing interest, fees, costs, and expenses. In connection with the foreclosure process, Quantum retained Hilco Valuation Services, LLC ("**Hilco**") to appraise Epica's IP assets. Hilco estimated the value of Epica's intellectual property, Epica's most significant asset, at approximately $3.3 million to $7.7 million. Hilco further concluded that the enterprise value of Epica was not likely to exceed the value of the intellectual property.

The Petitioning Creditors, however, have obtained a separate and credible expert opinion of value from Peter J. Conley of Prestwick Associates LLC. Mr. Conley's valuation places Epica's intellectual property assets in a range of $33.9 million to $50.0 million, with a base-case indication of approximately $43.5 million. This valuation is substantially higher than Hilco's valuation and demonstrates that Epica's IP assets have substantial equity for the estate after satisfaction of Quantum's secured debt. *See Declaration of Peter J. Conley.*

3.    The Shareholders' Efforts to Replace the Board: Since at least January 2023, Epica's board of directors has failed to hold an annual meeting of shareholders for the election of directors, in violation of both Nevada law and Section 7 of Article I of Epica's bylaws. Before 2023, the board allegedly held a majority of Epica's voting stock and voted for themselves to retain board seats in lieu of required annual shareholder meetings. As of no later than January 2023, however, the board no longer held a majority of Epica's issued and outstanding voting stock and could no longer unilaterally choose to exercise their majority to avoid an annual shareholder meeting. On April 23, 2026, Donald Stone II and J.W. Equities, LLC, both shareholders of Epica, delivered a stockholder demand to inspect and copy Epica's stock ledger pursuant to Nevada Revised Statutes § 78.105. In response, Epica provided its stock ledger as of April 30, 2026, showing 18,949,177 common shares with voting rights issued and outstanding.

On May 12, 2026, Mr. Stone's attorney sent a letter to Epica and each purported director demanding an annual meeting of the stockholders to address corporate governance failures and the board's refusal to hold annual meetings. Epica never responded to this demand. Because Epica's purported directors failed to hold an annual shareholder meeting, on May 20 and 21, 2026, stockholders organized and noticed a shareholder election by distributing Shareholder Consent forms pursuant to Section 8 of Article I of Epica's bylaws and Nevada Revised Statutes § 78.320(2). Shareholders holding at least 12,207,068 shares (64.4%) of Epica's outstanding voting common stock signed and returned their Shareholder Consents, affirmatively voting to set Epica's number of directors at three directors and electing John Gezelin, Robert Epstein, and Donald Stone as Epica's three new directors (the "**New Board**").

Despite the majority shareholders' vote for a New Board, Epica's prior directors have continued to make decisions for Epica and have refused to cede their control to the New Board.

HARRIS LAW PRACTICE, LLC
850 E. PATRIOT BLVD.
SUITE F
RENO, NEVADA 89511
TELEPHONE: (775) 786-7600

4.    The Consensual Transaction with Quantum and Filing of Involuntary Petitions: Beginning in January 2026, after alleged events of default under the Credit Agreement, Epica and Quantum engaged in discussions regarding a potential consensual transaction designed to preserve Alleged Debtors' going-concern value. On April 6, 2026, Quantum delivered a Notice of Events of Default, Acceleration of Obligations, Demand for Payment and Reservation of Rights Letter, which allegedly accelerated the obligations under the Credit Agreement.

Following acceleration, Quantum exercised remedies with respect to its collateral, including activating control over Epica's bank accounts via a Deposit Account Control Agreement, cutting off Epica's access to its cash.

On April 30, 2026, Quantum alleges that it caused a Notice of Public Disposition of Collateral to be served upon Epica and other parties entitled to notice under applicable law. The public foreclosure sale was initially scheduled for May 29, 2026.

On May 28, 2026, Epica and Quantum purportedly reached an agreement on a consensual transaction (the "**Consensual Transaction**") and executed the "Heads of Agreement," pursuant to which Quantum agreed to continue its foreclosure sale to June 8, 2026, with the understanding that the foreclosure sale would be further continued pending negotiation of definitive documents if the requisite shareholder consent was procured by Epica.

Petitioning Creditors then filed the involuntary petitions on June 4, 2026.

## JURISDICTION

The Court has subject matter jurisdiction to consider the relief requested in the Motion to Dismiss pursuant to 28 U.S.C. §§ 157(a) and 1334 (b). As required by LR 7008, Petitioning Creditors and Shareholders consent to entry by the Court of a final order on the Motion.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and may be determined by the Court. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409 because Epica is a Nevada corporation, with its registered office located in Carson City, Nevada. Quantum's

UCC financing statements against Epica's assets are allegedly filed with the Nevada Secretary of State.

<strong><u>LEGAL ARGUMENT</u></strong>

### A.  Legal Standard for Stay Relief

An involuntary case against a person may be commenced under 11 U.S.C. § 303(b)(1) by three or more entities, each of which holds a claim against the alleged debtor that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, if such noncontingent, undisputed claims aggregate at least $21,050 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims. 11 U.S.C. § 303. To qualify as a petitioning creditor, an entity must hold a claim that is not contingent or subject to a bona fide dispute as to liability or amount. The burden is on the petitioning creditor to establish qualification. *Hayden v. QDOS, Inc. (In re QDOS, Inc.)*, 607 B.R. 338, 343 (B.A.P. 9th Cir. 2019).

In the Ninth Circuit, a bona fide dispute exists if there is an objective basis for either a factual or a legal dispute as to the validity of the debt. *Liberty Tool v. Vortex Fishing Sys. (In Re Vortex Fishing Sys.)*, 277 F.3d 1057, 1064 (9th Cir. 2001). A bankruptcy court is not asked to evaluate the potential outcome of a dispute, but merely to determine whether there are facts that give rise to a legitimate disagreement over whether money is owed, or, in certain cases, how much. *Id.*  The existence of a counterclaim against a creditor does not automatically render the creditor's claim the subject of a bona fide dispute. *Id.* at 1066. So long as the petitioning creditor has established that there is no dispute regarding the debtor's liability on the creditor's claim, the creditor has standing under section 303(b) to bring an involuntary petition. *Chi. Title Ins. Co. v. Seko Inv., Inc. (In re Seko Inv., Inc.)*, 156 F.3d 1005, 1008 (9th Cir. 1998).  However, where a counterclaim arises out of the same transaction which forms the basis of the creditor's claim, then the principle of recoupment, which operates akin to a defense against a claim, can be seen as creating a dispute as to that claim. *Id.* at 1009. The mere existence of pending litigation or the filing of an answer is insufficient to establish the existence of a bona fide dispute. *Liberty Tool,* 277 F.3d at 1066.

After the filing of a petition under section 303 but before the case is dismissed or relief is ordered, a creditor holding an unsecured claim that is not contingent, other than a creditor filing under subsection (b) of section 303, may join in the petition with the same effect as if such joining creditor were a petitioning creditor under subsection (b). 11 U.S.C. § 303. The undisputed claims requirement of the Bankruptcy Code is not jurisdictional. Rather, it goes to the merits; an element that must be established to sustain an involuntary proceeding. Petitioning creditors cannot prevail unless they show that their claims are not subject to bona fide disputes, but the bankruptcy court is not without jurisdiction prior to this determination. *In re Rubin*, 769 F.2d 611, 615 (9th Cir. 1985).

**B.  The Petitioning Creditors Hold Liquidated, Undisputed Claims That Satisfy Section 303(b)(1)**

1.    Joe Soto's April 8, 2025 Email Establishes the Petitioning Creditors' Claims

As explained above, on April 8, 2025, Joe Soto sent an email to Dr. Kaila confirming that the three Petitioning Creditors collectively had paid Epica and Epica HH $17,476,193.23, which resulted in the Petitioning Creditors paying the Alleged Debtors in full for "44 units and only 35 units have been delivered to date." This email constitutes an unequivocal admission by Epica's highest executive officer that: (1) The Petitioning Creditors paid Alleged Debtors in full for 44 units; (2) Alleged Debtors delivered only 35 units; and (3) Alleged Debtors owe the Petitioning Creditors the value for nine undelivered units.

This admission eliminates any objective basis for a factual or legal dispute as to the validity of the Petitioning Creditors' claims. *Liberty Tool*, 277 F.3d at 1064. The Ninth Circuit has held that a bankruptcy court is not asked to evaluate the potential outcome of a dispute, but merely to determine whether there are facts that give rise to a legitimate disagreement over whether money is owed, or, in certain cases, how much. *Id.* Here, Epica's CEO has confirmed in writing that money is owed to Petitioning Creditors. There is no legitimate disagreement.

2. Epica's Alleged Disputes Are Pretextual and Contradict Its CEO's Admission

Alleged Debtors assert in the Motion to Dismiss that its "books and records reflect no amounts owing" to the Petitioning Creditors and that Alleged Debtors have no contractual

HARRIS LAW PRACTICE, LLC
850 E. PATRIOT BLVD.
SUITE F
RENO, NEVADA 89511
TELEPHONE:  (775) 786-7600

relationship with Devdend or Dr. Kaila individually. These assertions are contradicted by Joe Soto's April 8, 2025 email, which confirms that the Petitioning Creditors collectively paid Alleged Debtors for 44 units and received only 35.

Alleged Debtors' argument that they have no direct contractual relationship with Devdend or Dr. Kaila is a red herring. Any potential contractual relationship between Imaginalis and Advanced Imaging does not create a bona fide dispute as to whether the Alleged Debtors received the benefit of money paid to them by Petitioning Creditors and did not deliver any merchandise in return. To the contrary, Joe Soto's email acknowledges that the three Petitioning Creditors collectively paid Alleged Debtors for 44 units but only received 35 units, thereby recognizing all three entities as creditors.

Alleged Debtors' books and records may not reflect amounts owing to the Petitioning Creditors, but that accounting failure does not create a bona fide dispute where Epica's CEO has admitted in writing that prepayment was received and goods remain undelivered.

3. Alleged Debtors' Recoupment Argument Fails

Alleged Debtors also argue that they have a claim against Advanced Imaging arising from indemnity obligations pursuant to Section 10.1 of the Distribution Agreement that exceeds the amount of the claim asserted against Epica, and that this purported recoupment right renders Advanced Imaging's claim subject to bona fide dispute. This argument fails for three reasons.

First, Epica has not demonstrated that any indemnity obligation is presently due and owing. The Motion to Dismiss alleges that "Epica International's records reflect that Advanced Imaging owes Epica International in excess of $200,000 arising out of indemnity obligations pursuant to Section 10.1 of the Distribution Agreement, and representatives of Advanced Imaging (including Dr. Kaila) have acknowledged such indemnity obligations of Advanced Imaging in favor of Epica International." However, Epica has not alleged, much less established, that any indemnifiable event has occurred, that Epica has paid any indemnifiable loss, or that any condition precedent to indemnity has been satisfied. A bare assertion that indemnity obligations exist does not create a presently due and owing debt that can support recoupment.

HARRIS LAW PRACTICE, LLC
850 E. PATRIOT BLVD.
SUITE F
RENO, NEVADA 89511
TELEPHONE: (775) 786-7600

Second, even if an indemnity obligation were presently due, recoupment is a defense to a claim that arises out of the same transaction. Here, the Distribution Agreement governs both the sale of goods and potential indemnity obligations. However, Joe Soto's April 8, 2025 email confirms that the Petitioning Creditors paid for 44 units and received only 35. The claim for undelivered units is a straightforward claim for breach of contract, unjust enrichment, or quasi-contract for failure to deliver prepaid goods. Any purported indemnity obligation would arise from a separate breach or event under the Distribution Agreement, not from the same transaction as the claim for undelivered goods. The Ninth Circuit has held that recoupment can create a dispute as to a claim only where the counterclaim arises out of the same transaction which forms the basis of the creditor's claim. Epica has not shown that its alleged indemnity claim arises from the same transaction as the Petitioning Creditors' claim for undelivered goods.

Third, the existence of a counterclaim against a creditor does not automatically render the creditor's claim the subject of a bona fide dispute. *Chi. Title Ins. Co.*, 156 F.3d at 1008. So long as the petitioning creditor has established that there is no dispute regarding the debtor's liability on the creditor's claim, the creditor has standing under section 303(b) to bring an involuntary petition. *Id.* Here, Joe Soto's email establishes Alleged Debtors' liability. Any purported indemnity claim does not create a dispute as to that liability.

4. The Unsecured Claims Are Liquidated

The Petitioning Creditors' claims are liquidated. Joe Soto's email confirms that the Petitioning Creditors paid Alleged Debtors for 44 units and received only 35, leaving nine undelivered units. The total amount claimed by the Petitioning Creditors represents the prepaid value of the nine undelivered units. This amount is certain and calculable. Alleged Debtors do not dispute the unit price or the number of undelivered units confirmed in Joe Soto's email.

5. The Petitioning Creditors Have Standing Under Section 303(b)(1)

Each of the three Petitioning Creditors holds a claim that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount. The aggregate amount of their claims exceeds the $21,050 threshold under section 303(b)(1). The claims are unsecured and exceed any

HARRIS LAW PRACTICE, LLC
850 E. PATRIOT BLVD.
SUITE F
RENO, NEVADA 89511
TELEPHONE: (775) 786-7600

lien on property of Alleged Debtors securing such claims. Thus, the Petitioning Creditors have satisfied the requirements of section 303(b)(1).

**B.  The Court Should Not Abstain from hearing the Involuntary Petition**

Alleged Debtors argue that the Court should dismiss or abstain from hearing the involuntary petitions under 11 U.S.C. § 305(a)(1) because the interests of creditors and the Alleged Debtors would be better served by consummation of the Consensual Transaction outside of bankruptcy. This argument fails for several reasons.

1. The Consensual Transaction Does Not Protect the Interests of Unsecured Creditors

Alleged Debtors assert that the Consensual Transaction was designed to preserve going-concern value and maximize the value of Alleged Debtors' business without impacting the claims of unsecured creditors. However, the Consensual Transaction is essentially a foreclosure sale by Quantum, which would transfer substantially all of Alleged Debtors' assets to Quantum or its assignee in satisfaction of Quantum's secured debt. Alleged Debtors have not shown that Quantum is assuming any of Alleged Debtors' liabilities through the Consensual Transaction.

The Petitioning Creditors have shown that Epica's IP assets have substantial equity after satisfaction of Quantum's secured debt. If the Consensual Transaction is consummated outside of bankruptcy, that equity will be lost to unsecured creditors. Only in a bankruptcy proceeding can unsecured creditors ensure that Alleged Debtors' assets are valued accurately, that Quantum's secured debt is properly allowed, and that any surplus value is preserved for the estate.

2. The Involuntary Petition Does Not Impose Costs Without Benefit

Alleged Debtors argue that continued bankruptcy proceedings would impose substantial administrative costs without any corresponding benefit to creditors, given that Quantum holds first-priority liens on substantially all of Alleged Debtors' assets and the value of those assets is likely substantially less than the secured obligations. This argument rests on Hilco's valuation, which the Petitioning Creditors have refuted with a credible expert opinion placing Epica's IP assets at $33.9 million to $50.0 million. *See Conley Declaration*.

The Petitioning Creditors have also established that additional unsecured creditors are expected to join the involuntary petitions under section 303(c). On June 23, 2026, one additional

HARRIS LAW PRACTICE, LLC
850 E. PATRIOT BLVD.
SUITE F
RENO, NEVADA 89511
TELEPHONE:  (775) 786-7600

unsecured creditor has already joined Epica's involuntary petition. A bankruptcy proceeding will provide transparency and accountability for the benefit of all creditors, not just Quantum. The costs of administration are justified by the benefits of ensuring accurate asset valuations, proper allowance of claims, and equitable distribution of any surplus.

3. The Paradigm for Abstention Does Not Apply

Alleged Debtors argue that the facts of these cases present the precise paradigm in which Congress intended abstention to apply: an arrangement was being worked out between Alleged Debtors and their secured lender outside of bankruptcy, there is no prejudice to the rights of other creditors in that arrangement, and the involuntary petition was commenced by parties seeking to extract leverage through the bankruptcy process. This argument is meritless.

The paradigm for abstention under section 305(a) is where an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement, *and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment*.

Here, the Consensual Transaction is not an arrangement being worked out by creditors and the debtor. It is a foreclosure by a single secured lender that would leave unsecured creditors with nothing. There is substantial prejudice to the rights of unsecured creditors in that arrangement because Alleged Debtors' assets have equity that would be lost to unsecured creditors if the foreclosure or Consensual Transaction are consummated outside of bankruptcy.

Moreover, the Petitioning Creditors are not "recalcitrant creditors" seeking to extract leverage. They are creditors holding liquidated, undisputed claims who have been deprived of goods for which they paid in full. The involuntary petition serves the legitimate interests of unsecured creditors transparent administration, and equitable distribution.

**C.  Any Request for Damages or Fees is Premature**

Finally, Alleged Debtors request that the Court should assess damages against Petitioning Creditors. This request is unwarranted and premature at this point, because the Court has not dismissed the involuntary petitions, and Alleged Debtors have not shown entitlement to such fees or damages.

## CONCLUSION

The Petitioning Creditors hold liquidated, undisputed claims against Alleged Debtors, confirmed by Joe Soto's April 8, 2025 email. Alleged Debtors' alleged disputes are pretextual and contradict their CEO's admission. The Alleged Debtors' estates have potential substantial equity for unsecured creditors, as demonstrated by the Conley valuation placing Epica's IP assets at $33.9 million to $50.0 million. The Consensual Transaction would prejudice unsecured creditors and Epica's equity holders by transferring substantially all of Alleged Debtors' assets to Quantum or a third party in satisfaction of secured debt, leaving nothing for unsecured creditors and shareholders.

For these reasons, the Petitioning Creditors and Shareholders respectfully request that this Court:

1. Deny Alleged Debtors' Motion to Dismiss;

2. Grant the Petitioning Creditors a reasonable period to allow additional unsecured creditors to join under 11 U.S.C. § 303(c) before ruling on the Motion to Dismiss; and

3. Grant such other and further relief as this Court deems just and proper.

Respectfully submitted June 23, 2026.

HARRIS LAW PRACTICE LLC

*/s/ Norma Guariglia*
NORMA GUARIGLIA
Counsel for Petitioning Creditors and Shareholders

HARRIS LAW PRACTICE, LLC
850 E. PATRIOT BLVD.
SUITE F
RENO, NEVADA 89511
TELEPHONE: (775) 786-7600

**CERTIFICATE OF SERVICE**

On June 23, 2026, the foregoing document was served via ECF automated system to all parties registered with ECF in this case on the date and time I filed the document with the Court's ECF system.

I declare under penalty of perjury that the foregoing is true and correct.

Dated June 23, 2026.

*/s/ Norma Guariglia*

_____
Norma Guariglia

HARRIS LAW PRACTICE, LLC
850 E. PATRIOT BLVD.
SUITE F
RENO, NEVADA 89511
TELEPHONE: (775) 786-7600

14