_____
Honorable Gary Spraker
United States Bankruptcy Judge

Entered on Docket
July 01, 2026
_____

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>EPICA INTERNATIONAL, INC.,<br><br>Alleged Debtor. | Case No.: 26-50580-gs<br>Chapter 11<br><br><u>Hearing Date</u><br>DATE: June 26, 2026<br>TIME: 10:00 a.m. |

**MEMORANDUM DECISION ON ALLEGED DEBTORS' MOTION FOR
ORDER DISMISSING INVOLUNTARY PETITIONS**

On June 4, 2026, petitioning creditors Devdend LLC, Advanced Imaging LLC, and Sanjeev Kaila, M.D. filed an involuntary petition under chapter 11 against Epica International Inc. (International).[1] The alleged debtor has moved to dismiss the involuntary petition. International argues that none of the three petitioning creditors holds any claim against it. It contends that, at a minimum, any such claims are subject to a bona fide dispute that requires dismissal of the involuntary petition. The court granted International's request to hear the motion to dismiss on shortened time. The petitioning creditors timely filed their opposition and supplemented it with Dr. Kaila's declaration. The court held the hearing on the motion to dismiss

_____

[1] A similar motion has been filed in the involuntary bankruptcy case commenced against Epica Human Health, Inc. This decision addresses only the motion to dismiss International's involuntary bankruptcy. The court will enter a separate order addressing the motion to dismiss the involuntary bankruptcy case against Epica Human Health, Inc.

1

on June 26, 2026. At the conclusion of oral argument, the court took the matter under submission.

**Facts**

The involuntary petition states that Devdend has a claim against International in the amount of $954,482.17 for undelivered goods. The petition further represents that Advanced Imaging and Dr. Kaila also held claims against International for undelivered goods in the amounts of $54,853.258 [sic] and $1,552,418.04, respectively.

The motion to dismiss is supported by the declaration of Jose A. Soto III, International's Chief Executive Officer. The declaration explains International's relationship with the petitioning creditors. Mr. Soto states that International's subsidiary, Imaginalis S.R.L., an Italian entity, entered into a Distribution Agreement with Advanced Imaging on June 1, 2023, and attached a copy of that agreement as Exhibit A to his declaration. Imaginalis manufactured, marketed, and sold imaging equipment known as SeaFactorCT-3 and offered accessories including EpiCare. The Distribution Agreement required Advanced Imaging to place minimum orders of at least five units per order. Each unit was listed at $390,000, and $60,000 annually for EpiCare.[2] ECF No. 28-1 at 29.

Though Imaginalis has a direct contractual agreement with Advanced Imaging, Mr. Soto states in his declaration that *International's* books and records do not show any business relationship with any of the petitioning creditors, much less any existing debts owed to them. He does note, however, that Devdend did initiate wire transfers to International and Human Health in April 2025 "on account of payments owed by Advanced Imaging to Imaginalis (or an affiliate authorized to receive payment on behalf of Imaginalis) under the Distribution Agreement." ECF No. 28 at ¶ 26. According to Mr. Soto, Dr. Kaila has no commercial relationship with International directly in his individual capacity. *Id.* at ¶ 31.

---

[2] The annual fee for EpiCare was subject to discount if Advanced Imaging purchased two or more years of the service up front.

Additionally, International argues that under the Distribution Agreement, Advanced Imaging actually owes International $200,000 under the contractual indemnity obligations. Accordingly, it contends that the petitioning creditors and any claims they might hold are subject to a bona fide dispute.

In their opposition to the motion to dismiss, the petitioning creditors cite an email dated April 8, 2025, from Mr. Soto to Dr. Kaila. According to the petitioning creditors, the email recited that they had paid International $17,476,193.23 for 44 "units," but "only 35 units have been delivered to date." ECF No. 66 at 2. According to the petitioning creditors, "[t]his admission establishes that Alleged Debtors owe the Petitioning Creditors for nine undelivered units at a cost of approximately $390K per unit, a liquidated, undisputed debt." *Id.* Though no evidence of the email was included with the opposition, the declaration of Dr. Kaila filed the next day attached the April 8, 2025, email. ECF No. 69 at 5-6.  The declaration states that Dr. Kaila is a medical doctor and the manager of Devdend and Advanced Imaging. It further states that on April 7, 2025, he emailed Mr. Soto for an accounting "for payments made by Devdend LLC, Advanced Imaging, LLC, and me (through related entities) to Epica and its subsidiary, Epica Human Health LLC …  for the purchase of certain medical imaging equipment." ECF No. 69 at 2, ¶ 4.

The email attached to Dr. Kaila's declaration largely corroborates the petitioning creditors' recital of facts in their opposition. Mr. Soto's email confirms that "[t]he total deposits made by Advanced Imaging and its partners (collectively 'AI') are $17,476,193.23 (see attached spreadsheet)." *Id.* at 5. Mr. Soto further referenced that these payments, made through wire transfers, were "sent to Epica International and Epica Human Health." *Id.* He then stated that as of the date of the email,

> AI has made deposits on 51 or 56 units depending on how we apply the funds received on 11/14/2024.
> If we proceed with a production schedule for 56 units, then AI's remaining balance owed for units in process is $4,649,514.71.
> If we revert back to the production scheduling to 51 units then AI's remaining balance owed for units in process is $2,699,514.71.

> If we apply all funds received towards deposits and final payments, AI would
> have fully paid for 44 units, 35 units have been delivered to date.

ECF No. 69 at 5.

According to Dr. Kaila, Mr. Soto attached an accounting of the payments he referenced. *Id.* at 6. The payments ranged from June 1, 2023, to January 31, 2025. The first wire, transferred the same day Advanced Imaging signed the Distribution Agreement, was sent from Devdend to International. Overall, Devdend sent $3,900,000 to International and $7,015,000 to Human Health, for a total of $10,915,000 in wired funds. Portfolio Investment sent $5,605,693.23, Knight Palmer LLC sent $682,500, and Advanced Imaging sent $273,000, all to Human Health.

The accounting further reflects that $1,952,500 was wired from "Portfolio Investments Cor" to Human Health on November 14, 2024, presumably the payment referenced by Mr. Soto. *Id.* That amount equates to roughly five imaging units priced at $390,000 under the Distribution Agreement. Dr. Kaila concluded his declaration by stating: "My related entities and I have made other payments to Epica or Epica HH after January 31, 2025, and have other claims against the Alleged Debtors. But the value of the nine undelivered units reflects the undisputed amounts admittedly owed by Epica and Epica HH to me, Advanced Imaging, and Devdend not subject to any bona fide dispute." *Id.* at 2, ¶ 7.

On June 23, 2026, counsel for the petitioning creditors filed a Joinder in Involuntary Petition on behalf of e-Possible, Inc. ECF No. 64. The joinder states that e-Possible has an unsecured claim in excess of $11,500 and joins the involuntary petition as a petitioning creditor.

International's reply to the petitioning creditors' opposition largely focuses on matters outside the motion to dismiss. Relevant to the motion to dismiss, International relied on a supplemental declaration from Mr. Soto that stated:

> 13. Subsequent to the email referenced in the declaration of Dr. Kaila [D.E. 69], Dr. Kaila on behalf of Advanced Imaging and I had several additional discussions, including surrounding reducing the number of units to be delivered from 44 to 40 and applying certain other payments made on behalf of Advanced Imaging to installation, training and other costs for which Advanced Imaging was contractually obligated.

14. On June 30, 2025, Dr. Kaila on behalf of Advanced Imaging acknowledged "that all units are complete," and requested that Epica store the final 5 units at a facility in Italy.

ECF No. 74 at 3. Mr. Soto also attached a copy of the letter from Dr. Kaila dated June 30, 2025, he referenced in the supplemental declaration. The letter is addressed "To whom it may concern," and states:

Advanced Imaging ("AI") has made final payment, is taking title and "risk of loss" for the following 5 units. AI acknowledges that all units are complete as evidence by visual confirmation upon the last visit. AI is requesting that Epica store these units on their behalf at our Sesto Fiorentino, Italy facility (with potential delivery to Dubai) until further notice:
- SF0050, SF0051, SF0052, SF0053, and SF0054.

*Id.* at 7.

## Analysis

International's motion to dismiss, and the associated briefing, discuss numerous issues in addition to dismissal including its financial condition, possible debtor-in-possession financing, the need to make payroll this coming week, and abstention. The court heard this motion on shortened time, in large part, due to these concerns. However, the immediate matter addressed by this decision is the motion to dismiss the involuntary petition for lack of any qualifying creditors. Before the court addresses the substance of the arguments presented, the court must first address the procedural posture of the motion as presented.

### A.    The standard to be applied to the motion.

Section 303 authorizes the filing of an involuntary petition against a corporation. 11 U.S.C. §§ 303(a) and (b). The filing of an involuntary petition effectively commences an adversary proceeding; the petitioning creditor must serve the petition and a summons on the alleged debtor, Fed. R. Bankr. P. (Bankruptcy Rule) 1010(a), and the alleged debtor may contest the petition under Fed. R. Civ. P. (Civil Rule) 12. The alleged debtor may file an answer presenting defenses and objections within 21 days after the summons is served. Bankruptcy Rule 1011(b). Alternatively, the alleged debtor may file a motion under Civil Rule 12(b) before filing

5

an answer. Bankruptcy Rule 1011(b) and (c). International has filed such a motion, which extends the time to otherwise respond to the petition under Civil Rule 12(a). It did not, however, state which provision of Civil Rule 12(b) it invoked. Indeed, no party has specifically stated which subdivision applies. By a process of elimination, reading the provisions under Civil Rule 12(b) the court presumes that the motion is brought under subsection (b)(6) for the failure to state a claim. *See In re EB Holdings II, Inc.,* 589 B.R. 704, 723-24 (Bankr. D. Nev. 2017) (applying process of elimination under Civil Rule 12(b) to determine the applicable provision). Under Civil Rule 12(b)(6), the motion "may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Hayden v. QDOS, Inc. (In re QDOS, Inc.)*, 607 B.R. 338, 345 (B.A.P. 9th Cir. 2019) (citing *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1121 (9th Cir. 2008)).

Under the established standards of Civil Rule 12(b), the court must accept as true all well pled factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). The court must then construe those facts in the light most favorable to the non-moving party and determine if they state a plausible claim for relief. *Id.* at 679; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). However, neither International, nor the petitioning creditors, have limited themselves to the allegations in the involuntary petition. Indeed, International's motion directly controverts the petitioning creditors' asserted claims that form the basis of the petition. In support of its motion, International has submitted and relies on Mr. Soto's declaration and supplemental declaration. In turn, the petitioning creditors oppose the motion by arguing that they each have separate claims against International based on a series of wire transfers. In support of their argument, they rely on an email from Mr. Soto to Dr. Kaila, which they submit as an exhibit to Dr. Kaila's declaration.

Where matters outside the pleadings are introduced as part of a motion filed under Civil Rule 12(b)(6), "and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Civil Rule 12(d); *see EB Holdings II,* 589 B.R. at 724 (discussing conversion of a motion to dismiss involuntary petition to motion for summary judgment). No one

6

has objected to the submission and consideration of matters beyond the petition. As the above factual discussion demonstrates, it is difficult to imagine how the parties and court could examine the petitioning creditors' claims without the benefit of matters beyond the scope of the petition. For this reason, the court will not exclude the declarations and evidence presented. The court shall convert the motion to a motion for summary judgment under Rule 56, made applicable in litigation involving involuntary petitions under Bankruptcy Rule 1018.

Civil Rule 12(d) further provides that where a court converts a motion to dismiss to summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." There is no formal notice requirement to convert the motion to dismiss to summary judgment, but the parties must have "a full and fair opportunity to ventilate the issues involved in the motion." *Fernandez v. GE Capital Mortg. Servs. (In re Fernandez),* 227 B.R. 174, 179 (B.A.P. 9th Cir. 1998). Courts are normally expected to give the losing party ten days' notice and an opportunity to present new evidence before granting relief after converting a motion to dismiss into a motion for summary judgment. *Cunningham v. Rothery (In re Rothery)*, 143 F.3d 546, 549 (9th Cir. 1998). But appropriate notice and opportunity to address the issues is satisfied "if the non-moving party is 'fairly apprised' before the hearing that the court will look beyond the pleadings." *Id.* (citing *Mayer v. Wedgewood Neighborhood Coalition*, 707 F.2d 1020, 1021 (9th Cir.1983)). Pertinent here, "[a] party is 'fairly appraised' that the court will in fact be deciding a summary judgement motion if that party submits matters outside the pleadings to the judge and invites consideration of them." *Id.* (citing *Grove v. Mead School Dist. No. 354*, 753 F.2d 1528, 1533 (9th Cir. 1985)); *see also In re Capital Finance, Inc.,* 2007 WL 7535047, at *10 (B.A.P. 9th Cir. Nov. 14, 2007).

The parties are familiar with the nature of the current dispute. The sole issue considered in this order is whether the three petitioning creditors have noncontingent claims against International that were not subject to any bona fide dispute as to liability or amount. International denies that the petitioning creditors hold any claims against it. The motion is supported by Mr. Soto's declaration, which addresses that point and attaches the Distribution Agreement. The

petitioning creditors opposed the motion by reference to Mr. Soto's email and accounting, which it presented via Dr. Kaila's declaration. Accordingly, both parties have been fairly appraised that the court would consider the evidence outside the pleadings they have both presented. Moreover, the basis and creation of the petitioning creditors' claims is a matter squarely within their knowledge, presumably addressed and established prior to filing the involuntary petition. Though the matter was heard on shortened time, they have not sought additional time to present other evidence on their claims. Being well aware of the issues and evidence, and having invited the court to consider such, no further notice or opportunity to present new evidence is required.

> **B.** **The requirement of noncontingent claims that are not subject to a bona fide dispute.**

Section 303(b)(1) provides that "[a]n involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title…by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount…if such noncontingent, undisputed claims aggregate at least $21,050…more than the value of any lien on property of the debtor securing such claims held by the holders of such claims…." Therefore, a petitioning creditor's claim cannot be either contingent or the subject of a bona fide dispute as to liability or amount. *Dep't of Revenue v. Blixseth*, 942 F.3d 1179, 1183 (9th Cir. 2019). The determination of a bona fide dispute under Section 303(b) is made as of the petition date. *In re Petrus*, 662 B.R. 713, 758 (Bankr. D. Nev. 2024). In the Ninth Circuit, "a creditor whose claim is the subject of a bona fide dispute as to amount lacks standing to serve as a petitioning creditor under § 303(b)(1) even if a portion of the claim amount is undisputed." *Blixseth*, 942 F.3d at 1186.

An objective standard applies to whether a bona fide dispute exists for purposes of § 303(b)(1) as to either liability or amount. *EB Holdings II,* 589 B.R. at 722 (citing *Marciano v.*

8

*Chapnick (In re Marciano)*, 708 F.3d 1123, 1126 (9th Cir. 2013)). "For a majority of the federal circuits, including the Ninth Circuit, a 'bona fide dispute' exists if 'there is an objective basis for either a factual or legal dispute as to the validity of a debt.'" *Id.* (quoting *Liberty Tool & Mfg. v. Vortex Fishing Sys., Inc. (In re Vortex Fishing Sys., Inc.)*, 277 F.3d 1057, 1064 (9th Cir. 2002)). A bona fide dispute exists under § 303(b)(1) 'if there is either a genuine issue of material fact that bears upon the debtor's liability [or the amount of a debt], or a meritorious contention as to the application of law to undisputed facts.'" *Id.* (quoting *Vortex Fishing*, 277 F.3d at 1064); *see also QDOS, Inc.,* 607 B.R. at 343. "The burden is on the [p]etitioning [c]reditors to establish a prima facie case that there is no bona fide dispute as to both liability or amount. If this burden is satisfied, then the burden shifts to the alleged [d]ebtor[] to demonstrate that a bona fide dispute exists as to liability or amount." *In re Betteroads Asphalt, LLC*, 594 B.R. 516, 544 (Bankr. D. P.R. 2018).

As set forth in the involuntary petition, the petitioning creditors allege that they have noncontingent claims in separate amounts against International that are not subject to a bona fide dispute arising from undelivered goods. The petition does not provide any details or make any allegations regarding the undelivered goods, International's obligation to deliver them to each of the petitioning creditors, or why International would be liable for the undelivered goods.

Based on the declaration of Dr. Kaila and Mr. Soto's April 8, 2025, email, the petitioning creditors argue that International was liable for the value of nine undelivered units. They contend that they have a contract with International because Mr. Soto's email acknowledged the three petitioning creditors paid International for 44 units but received only 35 units. And at oral argument, counsel for the petitioning creditors argued that each creditor held a claim based on an agreement.

9

Mr. Soto's email provides an accounting of wired funds to be used for the purchase of units and accessories. No written contract between the parties that wired those funds and the parties that received the funds has been identified. Nor has there been any explanation why those parties wired and received the funds, or the terms of any such agreements. As such, the petitioning creditors have failed to explain why International was legally obligated to deliver nine "units," much less deliver them to the petitioning creditors. Indeed, they have not even stated what units each of them supposedly purchased. Mr. Soto's email references units, which the petitioning creditors say cost approximately $390,000. ECF No. 66 at 2. This statement is not supported by any direct evidence from the petitioning creditors. Yet, it is consistent with the stated purchase price for each imaging unit under the Distribution Agreement between Imaginalis and Advanced Imaging, exclusive of accessories that were priced separately.

Moreover, the numbers detailed in Mr. Soto's email generally support the sale of the units at $390,000. Mr. Soto detailed the $17,476,193.23 paid in "deposits" for both units and accessories. From this amount, he deducted $285,707.94 because this amount could not be adjusted if the parties wanted to apply the deposits in some different manner. Deducting that amount results in a balance of $17,190,485.29. That amount divided by the $390,000 purchase price per unit would result in payment of 44.08 units, essentially equivalent to the 44 units Mr. Soto stated had been paid. Yet, the only basis in the record for the purchase and sale of units for $390,000 and accessories is the Distribution Agreement between *Imaginalis* and Advanced Imaging. There is no similar contract between Devdend, Advanced Imaging, or Dr. Kaila on the one hand and *International* on the other.

The petitioning creditors ask the court to simply follow the money – they transferred millions to International and Human Health and state that they did not receive all of the units and accessories they purchased. But there is no evidence or explanation why the funds were wired to

International or Human Health or what, if any, obligation it created for the receipt of those funds. These entities are limited liability companies. Each has a separate identity. Each holds separate rights and is liable for separate debts absent some legal theory granting rights and imposing liability on multiple parties. It is unclear what, if any, obligation International had in receiving any wired funds.

There is a fair inference that Devdend and Advanced Imaging wired money to International and Human Health to purchase the imaging equipment and accessories from Imaginalis. But there is no evidence that Dr. Kaila individually forwarded any personal funds to either International or Human Health. As to the wired funds detailed in Mr. Soto's accounting, only Devdend wired money to International. Mr. Soto's accounting shows that Devdend wired the first two payments for the units totaling an aggregate of $3,900,000 to International. ECF No. 69 at 8. Those are the only wires sent to International according to the accounting, the rest of the funds were sent to Human Health. Even under the petitioning creditors' theory, there is nothing to suggest that either Advanced Imaging or Dr. Kaila have any claims against International.

Devdend has alleged a claim against International in the amount of $954,482.17 in the involuntary petition without any explanation or support for the calculation of that claim. It is hard to mistake that Devdend's total payments equal 10 units at $390,000 each. Given that Devdend's wires to International were the first deposits supposedly made to purchase the units, it is unclear why the 35 units Mr. Soto said were delivered as of the date of his email did not satisfy any obligation owed by International.

Further to this point, the petitioning creditors' argument that Imaginalis failed to deliver 44 units as required under the Distribution Agreement or some other undefined agreement, is equally unclear. Mr. Soto's email stated that as of April 2025, Advanced Imaging and its partners had paid over $17 million in "deposits" on account of 51 or 56 units and accessories depending

11

on how the funds were to be applied. It appears that the application of funds Mr. Soto referenced in his email was the $1,952,500 wire from Portfolio Investments Cor dated November 14, 2024, sent to Human Health. Mr. Soto provided several options depending on how many units Advanced Imaging wanted to proceed forward with production. He explained that if Advanced Imaging wanted to proceed with either 51 or 56 units there was a remaining balance of roughly $2.7-$4.6 million outstanding, respectively. Alternatively, Mr. Soto offered that if all the funds currently received were applied, Advanced Imaging would have paid in full for 44 units. Mr. Soto concluded that 35 units had been "delivered to date." ECF No. 69 at 5. This discussion ignored the accessories available from Imaginalis listed in the Distribution Agreement, including the EpiCare package at $60,000 per year per unit.

The petitioning creditors never specifically say how Advanced Imaging decided to proceed in response to Mr. Soto's email. As of April 8, 2025, Mr. Soto provided Dr. Kaila with options on how to apply the deposits. If Advanced Imaging sought to proceed with either the 51 or 56 units referenced in the email, additional monies were required. The failure to provide those funds to purchase the 51 or 56 units presumably would establish a breach of contract claim against Advanced Imaging. But the petitioning creditors merely state that International failed to provide nine units to them collectively.

It is far from certain that anyone was obligated to deliver nine additional units as a result of the monies forwarded to International and Human Health. This confusion is supported by Mr. Soto's supplemental declaration stating that he subsequently discussed the number of units to be delivered and there was an agreement to reduce the total number of units to 40. ECF No. 74 at 3, ¶ 13. This was supported by a letter dated June 30, 2025, signed by Dr. Kaila that confirmed receipt of five units upon "final payment" and International was to store those units in Italy at Advanced Imaging's request. *Id*. at 7. At $390,000 per unit, 40 units would have cost

12

$15,600,000. This is still less than the $17 million in deposits reflected in the accounting. This may have been addressed by Mr. Soto's supplemental declaration that states other payments made on behalf of Advanced Imaging were applied to "installation, training and other costs for which Advanced Imaging was contractually obligated." *Id*. at 3, ¶ 13. Ultimately, the evidence in the record is far from clear how Advanced Imaging elected to proceed and how any such decision affects any accounting of the $17 million in wires detailed in Mr. Soto's accounting.

The petitioning creditors' claims are rife with bona fide disputes as to liability and the amount of each of their claims. They appear to collectively assert contractual rights and damages arising from the Distribution Agreement with Imaginalis, an entity separate from International. Yet, only Devdend wired money to International, apparently to purchase imaging equipment and accessories from Imaginalis under the Distribution Agreement, though neither Devdend nor International were parties to that contract. There is no evidence that either Advanced Imaging or Dr. Kaila, in his individual capacity, wired money or had any other dealings directly with International. Complicating matters, the petitioning creditors have failed to state and develop a coherent claim against International. They appear to assert a singular claim for nine undelivered imaging units that cost $390,000 each. The math suggests that the total resulting claim would be $3,510,000. Yet, the petitioning creditors state discrete individual claims of differing amounts totaling $2,561,753.49, without explanation. After briefing and oral argument, the court does not understand the theory of liability or the calculation of the individual claims.

At this stage, the court does not adjudicate the claims. But the issue presented by International's motion, which has been converted to one under summary judgment, is whether there is a genuine dispute of material fact that a bona fide dispute exists as to the petitioning creditors' claims such that a trial is necessary. Where the petitioning creditors' claims are so vague, ill-defined, and conclusory as to be inherently subject to a bona fide dispute as to both

13

liability and amount summary judgment dismissing the involuntary petition is appropriate. *See generally Laxmi Jewel Inc. v. C & C Jewelry Mfg., Inc. (In re C & C Jewelry Mfg., Inc.)* 2011 WL 36340326, \*\*8-12 (B.A.P. 9th Cir. Apr. 14, 2009) (bona fide dispute existed as to the amount of the petitioning creditors' claims where conflicting documentary evidence created a genuine issue of material fact regarding the amounts owed to each petitioning creditor); *In re Biogenetic Technologies, Inc.*, 248 B.R. 852, 859 (Bankr. M.D. Fla. 1999) (sole petitioning creditor's claim was subject to bona fide dispute where among other things, "[t]he [c]ourt cannot determine from the record whether a new oral agreement was entered…or whether the written [a]greement remained in effect, and the subsequent negotiations represented only a failed effort to reach a larger accommodation."); *In re Quantum Cool, LLC*, 2013 WL 3733182, at \*10 (Bankr. E.D.N.C. July 15, 2013) (bona fide dispute where the alleged debtor presented "sufficient evidence to create a factual dispute as to whether the parties modified the notes [underlying the petitioning creditor's debt] through either a subsequent oral agreement or their course of dealing. Further, based on a limited analysis of [state] law, there is a genuine legal issue over whether the alleged agreements and conduct would, as a matter of law, be enforceable to modify the notes.").

Perhaps some agreement could exist that might impose liability against International for the receipt of the $3,900,000 wired by Devdend. It is equally possible, if not more so, that there is no such agreement, or the transactions are governed by the terms of the Distribution Agreement to which neither the petitioning creditors or International are parties, or any such obligations have been performed, or only Devdend has a claim in some amount that has yet to be supported. But this universe of possibilities amply demonstrates that even on summary judgment, there is no genuine question that a bona fide dispute exists. The petitioning creditors chose to put International into an involuntary chapter 11 bankruptcy on these ill-defined claims. They should

14

be able to articulate and support the theory of liability and amounts of their claims in fact and law. They have failed to do so. As such, there is no genuine issue of material fact that the petitioning creditors' claims are subject to a bona fide dispute.

### C.      Additional time to join the petition.

Ordinarily, granting a motion to dismiss or entering summary judgment should end an adversary proceeding. But dismissing an involuntary bankruptcy is more complicated than typical litigation. Bankruptcy Rule 1003 provides in relevant part:

> (b)      If an involuntary petition is filed by fewer than 3 creditors and the debtor's answer alleges the existence of 12 or more creditors as provided in § 303(b), the debtor must attach to the answer:
>
>   (1) the names and addresses of all creditors; and
>
>   (2) a brief statement of the nature and amount of each creditor's claim.
>
> (c)      Additional Time to Join. If there appear to be 12 or more creditors, the court must allow a reasonable time for other creditors to join the petition before holding a hearing on it.

At oral argument, counsel for the petitioning creditors argued that the court must allow a reasonable time for other creditors to join the petition under Bankruptcy Rule 1003(c). This argument was not raised in the petitioning creditors' opposition. However, shortly before oral argument another putative unsecured creditor joined the petition. ECF No. 64. Since that time, two additional putative unsecured creditors have also joined the petition. ECF Nos. 75, 77.[3]

The involuntary petition does not discuss the number of applicable creditors. Nor has the briefing or evidence presented on the motion. Accordingly, the court must assume at the moment

---

[3] On June 30, 2026, International filed the "Verified Supplement to Motion to Dismiss Objecting to Joinder of Petitioning Creditors" (ECF No. 84), challenging the two joinders filed at ECF Nos. 75 and 77. First, the court did not authorize the filing of supplemental briefing. Second, the arguments presented in the purported supplement were not raised in the briefing or at argument on the motion, and thus the court will not consider those arguments in the form of a supplement. Should International wish the court to address its arguments, it must file a separate motion which has been properly noticed. The supplemental briefing requested in this order addresses only whether the court must allow additional joinders or whether dismissal is appropriate based on the court's conclusion that none of the petitioning creditors qualified under § 303(b)(1).

15

that International had less than 12 creditors and only one creditor is, therefore, required to place International into an involuntary bankruptcy under § 303(b)(2). *See QDOS, Inc.,* 607 B.R. at 346-47. International has not addressed the number of creditors or filed an answer in light of the pending motion. The subsequent development of three possible creditors joining the petition to satisfy the numerosity requirement suggests that the court must tread carefully before dismissing the case. The court is well aware that this matter was not discussed at oral argument given the timing of additional joinders. Yet, as in *QDOS, Inc.,* there appears to be a triable question of fact as to the numerosity and qualification of the new putative creditors that have joined the petition.

On the other hand, the court is also concerned with the procedural posture of this case. Based on the above discussion of the petitioning creditors' claims, the court is concerned how the petitioning creditors believed that they held qualifying claims against International that were not subject to bona fide dispute. It appears that there is at least an argument that they may have used the gap period in an involuntary bankruptcy that should not have been filed to find creditors to support their involuntary petition. The briefing and oral argument to date suggest that competing factions are vying for control over International's assets, specifically its intellectual property, and the petitioning creditors filed the involuntary petition to stay the secured creditors' collection.

Unlike *QDOS, Inc.* the court has found that neither Advanced Imaging nor Dr. Kaila has any claim against International based on Mr. Soto's unrebutted accounting. It has also detailed that Devdend's asserted claims are so ill-defined as to warrant summary judgment that a bona fide dispute exists. The parties have not yet briefed whether subsequent creditors can save an involuntary case that should not have been filed. The court will, therefore, set a short deadline for the parties to brief whether the court must, or should, accept the subsequent joinders in the petition and require International to file an answer.

16

Additionally, the parties are asked to discuss whether the court may take this decision into account on the pending motion for relief from stay under 11 U.S.C. § 362(d)(1).[4]

For these reasons,

IT IS HEREBY ORDERED that:

1. **No later than July 6, 2026**, International must file with the court supplemental briefing addressing (1) whether it must file a list of creditors in accordance with Bankruptcy Rule 1003(b) and what notice, if any, the court must provide to International's creditors of their opportunity to join as petitioning creditor under Bankruptcy Rule 1003(c) and the BAP's decision in *QDOS, Inc.*, and (2) whether the court may consider the evidence presented on dismissal in its decision on Quantum's motion for relief from the automatic stay (ECF No. 41, as amended).

2. Responses to the supplemental briefing must be filed with the court and served on counsel for International **no later than July 8, 2026**.

3. Replies must be filed with the court and served on counsel for the respondents no later than 12:00 p.m. on **July 10, 2026**.

IT IS FURTHER ORDERED that upon receipt of the supplemental briefing, the court will take this matter under advisement and no further argument or briefing will be considered.

\* \* \* \* \*

Copy sent to all parties and/or their counsel via CM/ECF Electronic Notice.

\# \# \#

---

[4] The court intends to review the supplemental briefing regarding the motion for relief from stay and promptly enter a separate order addressing that motion and setting a date for a final hearing on the motion if necessary.